| | | |
|---|---|---|
| ROBERT ORNELAS, | ) | |
| | ) | |
| Petitioner, | ) | No. 12 C 08476 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MICHAEL LEMKE, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Robert Ornelas has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254,[1] challenging his 1996 conviction for first-degree murder. R. 11, Am. Habeas Pet. For the reasons that follow, his petition is denied, and no certificate of appealability will issue.

## I. Background

A federal habeas court presumes that the factual findings made by the last state court to decide the case on the merits are correct, unless those findings are rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012). Ornelas has not rebutted this

---

[1]The Court has subject matter jurisdiction under 28 U.S.C. § 2241.

presumption, so the following sets forth the facts underlying Ornelas's state criminal conviction.[2]

At around midnight on November 11, 1990, Chicago Police Officer John Boitch received a dispatch that two potential gunshot victims had been found in a car. The victims were later identified as Jay Mosqueda and Robert Cheeks. Chicago Police Detective James Boylan was assigned to investigate the double homicide. As part of his investigation, Detective Boylan interviewed Dion Castillo, who had attended a nearby party on the night in question. Castillo informed Detective Boyland that the night of the shooting, Robert Ornelas had attempted to gain entry to the party and, upon being refused, discharged a gun.

### A. Arrest & Pre-Trial

Four days later, Ornelas and three other men were arrested in Frankfort, Illinois, when an Illinois State Trooper responded to a call regarding a fight in progress at a local White Hen. Two of the men were found to be in possession of narcotics, and all appeared to be under the influence of drugs. Ornelas was not found with contraband on his person, but he was arrested along with the other men.

Once in police custody, one of the men arrested with Ornelas, William Luedtke, informed Illinois State Police investigating agent Peter Hwang that Ornelas had committed a double homicide on the south side of Chicago two nights earlier. Luedtke stated that on November 11, 1990, at around 11:30 p.m., Ornelas

---

[2]The background section is adopted, with some non-substantive changes, from the last state court opinion to fully lay out the facts of Ornelas's conviction and post-conviction review, *People v. Ornelas*, No. 1-10-2100, slip op. at 4 (Ill. App. Ct. May 10, 2012), *available at* R. 26-4, State's Exh. J.

stopped by his house and appeared nervous and edgy. The following day, Ornelas told Luedtke that he had committed a double homicide the previous night. Ornelas said that he had ingested LSD and went to a party. When Ornelas was denied access to the party, he "blew off a round" in the backyard and began walking home. Ornelas said that, on his walk, he encountered "two guys in a car" who "were looking for trouble" and that he shot both of the men with a shotgun.

After speaking with Luedtke, Illinois State Police Agent Hwang called the Chicago Police Department, Area 2 Violent Crimes. During the call, Hwang was informed that Chicago Police had been looking for Ornelas as a suspect in the double homicide. At around 3:00 p.m., Chicago Police Detectives Yucaitis and Brownfield arrived at the Illinois State Police District 5 Headquarters to talk to Ornelas and then to Luedtke, who provided them with a written statement. After speaking with Luedtke, the police returned to speak to Ornelas. They orally informed Ornelas of his *Miranda* rights, and Ornelas then confessed to the murder of Cheeks and Mosqueda. Ornelas explained that he was a member of the Vice Lords street gang and that the victims were members of the King Cobra street gang and that he fired two shots at the automobile in which the victims were sitting. Ornelas stated that he fired the shotgun in self-defense.

Public defender Phil Mullane was then appointed to represent Ornelas. At the time, Mullane was employed by the Cook County Public Defender's Office and was the supervisor of the Murder Task Force. Because Mullane and Ornelas had

grown up together, Mullane volunteered to represent Ornelas and recruited several other public defenders to assist him with Ornelas's case.

With Mullane's assistance, Ornelas filed pre-trial motions to quash his arrest and suppress his inculpatory statements, arguing that he had been under the influence of narcotics at the time he made his statements and did not have the capacity to waive his *Miranda* rights or give a voluntary statement. Ornelas also alleged that his statements were involuntary because they were obtained as a result of physical, psychological, and mental coercion. The State requested clarification on Ornelas's claim of physical coercion, and Mullane orally amended the motion to include the allegation that Ornelas had been slapped and punched.

The trial court denied Ornelas's motion to quash his arrest as well as his motion to suppress his statement. With respect to the motion to suppress, the court ruled that suppression was not warranted because Ornelas was coherent at the time he made the statement and his statement was voluntary. After the trial court denied Ornelas's pre-trial motions, he elected to waive his right to a jury trial and proceeded by way of a bench trial.

## B. Trial

At trial, the State elicited testimony from a witness who had attended the party the night of the shooting and heard what sounded like a gunshot between 11:00 and 11:30 p.m.; Castillo, who had also attended the party and told Detective James Boylan that Ornelas had attempted to gain entry to the party and fired his gun before leaving the area; William Luedtke, who recounted Ornelas's confession

to him regarding the double homicide; and Illinois State Police Agent Hwang, who provided testimony that was consistent with the testimony he had provided at the prior hearing on Ornelas's pre-trial motions. With respect to Ornelas's statement, Hwang stated that the first time that he and Detectives Brownfield and Yucaitis spoke to Ornelas together on November 15, 1990, Ornelas initially claimed that he had been with a woman named Dawn somewhere in Chicago Heights on the night of the double homicide. Ornelas could not recall the exact address. When Agent Hwang and the detectives returned to speak to Ornelas after conversing with Luedtke, Ornelas admitted to the offense.

Detective Mike Gerhardstein testified that in November 1990, he was working as an Assistant State's Attorney. On November 15, 1990, ASA Gerhardstein spoke with, and took a statement from, Ornelas. In the statement, Ornelas admitted that he was denied entrance to a party and that he fired his 12-gage shotgun in the backyard as he began walking away from the party. Ornelas continued walking and observed Jay Mosqueda and a "black guy" sitting in an automobile. Ornelas stated that he knew Mosqueda because he used to beat Ornelas when they were both younger. Ornelas was also aware that Mosqueda was a member of the King Cobra street gang, whereas Ornelas was a Vice Lord. Ornelas and Mosqueda began yelling at each other, but Ornelas could not remember what either of them said. Ornelas told Gerhardstein that he thought Mosqueda and Cheeks were going to run him over with their automobile and that he fired his shotgun through the car's passenger side window and hit Mosqueda in the face.

Ornelas then fired at Cheeks and ran away, destroyed the shotgun, and went to hide with friends in Whiting, Indiana.

At the bench trial, the court found Ornelas guilty of the first-degree murder of Mosqueda and Cheeks and sentenced him to natural life imprisonment.

## C. Direct Appeal

Ornelas appealed his conviction and sentence. On appeal, Ornelas argued that the trial court erred in denying his motion to quash his arrest because police lacked probable cause to arrest him. Ornelas further argued that the trial court also erred in failing to suppress his statements because his statements were not sufficiently attenuated from his illegal arrest. In a written opinion, the Appellate Court of Illinois affirmed Ornelas's conviction. *People v. Ornelas*, 693 N.E.2d 1247 (Ill. App. Ct. 1998). It held that even if Ornelas's arrest was illegal, his statement was sufficiently attenuated from the arrest because it occurred hours later and only after Ornelas learned of Luedtke's statement. Ornelas subsequently filed a petition for leave to appeal, which the Illinois Supreme Court denied. *People v. Ornelas*, 705 N.E.2d 446 (Ill. 1998).

## D. Post-Conviction Proceedings

In April 1999, Ornelas, with the assistance of post-conviction counsel, filed a petition for post-conviction relief. Ornelas alleged that he was denied his right to effective assistance of trial counsel when counsel failed to call him as a witness to testify at his pre-trial suppression hearing. Had he been called, Ornelas alleged, he would have testified that his statement was the result of the physical abuse that

was inflicted on him by Detectives Yucaitis and Brownfield. Ornelas argued that trial counsel further erred in failing to interview and call as witnesses other individuals who experienced the systematic abuse known to occur at Area 2. Finally, Ornelas maintained that appellate counsel had also rendered ineffective assistance when he failed to raise these issues on appeal.

Ornelas later filed an amended post-conviction petition in August 2003. In it, Ornelas advanced the same allegations regarding ineffective assistance of trial and appellate counsel. Attached to the petition were a number of exhibits including an affidavit completed by Ornelas detailing the alleged physical abuse he suffered as well as different reports and proceedings regarding investigations into the Area 2 torture allegations that occurred under the tenure of Chicago Police Lieutenant Jon Burge.[3]

In his affidavit, Ornelas indicated that Detectives Yucaitis and Brownfield "choked," "slapped and punched [him] about the head and body" and demanded that Ornelas admit to the murders of Mosqueda and Cheeks. Ornelas also alleged that the detectives pulled his hair, "repeatedly slapped [his] ears with their open hands,"

---

[3]Among the additional exhibits attached to Ornelas's amended post-conviction petition was a report authored by Michael Goldston (the Goldston Report) which concluded that the physical abuse of suspects by Area 2 personnel under the tenure of Chicago Police Lieutenant Jon Burge was systemic. The report identified Detective Yucaitis as a "player," because his name was referenced on multiple occasions in connection with abuse allegations. Ornelas also included a finding by the Police Board of the City of Chicago that Detective Yucaitis had been aware of abuse inflicted on Andrew Wilson, a prisoner, by Burge. Although the Board found that Yucaitis did not take part in the torture, it concluded that Yucaitis violated the Department's Rules and Regulations when he failed to prevent the abuse or obtain medical care for Wilson and suspended Yucaitis for fifteen months. An affidavit completed by Lavert Jones, another prisoner, was also attached to Ornelas's motion for post-conviction relief. In it, Jones averred that he also had suffered physical abuse at the hands of Detective Yucaitis.

and threatened to inflict additional and more severe abuse if he did not provide them with a confession. Although he acknowledged that he made incriminating statements, Ornelas alleged that the "statements were involuntary and solely the product of the physical abuse and verbal threats [he] was subjected to by Yucaitis and Brownfield." Ornelas indicated that he informed Mullane of the circumstances that led to his confession and expressed his willingness to testify about the abuse inflicted on him by the detectives but stated that Mullane told him that his testimony was not necessary and would be "save[d] for trial."

At an evidentiary hearing, Steve Rymus testified that he has known Ornelas since they both were children and that he lived across the street from him in November 1990. After the murders, two police officers arrived at Rymus's house without a warrant, "grabbed" him, handcuffed him, and took him to the police station. There, the officers placed Rymus in a small room and began asking him about the murders. Rymus was asked whether he had been at Dion Castillo's party on Calhoun Street, and he confirmed that he had attended the party. Rymus was also asked whether Ornelas attended the party, but Rymus denied that Ornelas had been there. The officers then began to abuse Rymus. He testified that they punched him, slapped him, and squeezed his testicles. The officers said that they wanted Rymus to make a statement and say that Ornelas was at the party and that Ornelas left the party and committed the murders. When Rymus refused to implicate Ornelas, the officers continued to beat Rymus and threatened to implicate him instead if he continued to refuse to cooperate.

Rymus testified that he suffered bruising on his face and around his testicles but did not seek medical treatment. He admitted that he did not tell Ornelas about the incident before or after Ornelas was arrested for the murders. The only person that Rymus initially talked to about the abuse was his mother. Later, he spoke to Ornelas's post-conviction counsel after Ornelas's mother called him and told him to do so. Although Rymus knew Phil Mullane, Ornelas's trial counsel, from the neighborhood, Rymus never contacted him to tell him about what had occurred. He indicated that he was never contacted by anyone on Ornelas's behalf, but stated that if he had been contacted, he would have been willing to testify on Ornelas's behalf about the beating he was subjected to shortly after the murders. Rymus acknowledged that he never filed a complaint with the Chicago Police Department or filed a lawsuit.

Mary Rymus, Steve's mother, testified that when she arrived at the police station to pick up Steve, her son's face was swollen and puffy and she saw evidence of a bruise on one of his cheeks. She also observed that Steve kept touching his crotch. Mary's son told her that police officers had beaten him up and squeezed his testicles while they questioned him. Steve also told her that the officers were trying to get him to make a statement that implicated Ornelas in the murders of Mosqueda and Cheeks. She did not take her son to receive medical treatment. Mary further acknowledged that she had been friends with Ornelas's mother for over fifty years, but that she never spoke of her son's interrogation until recently when Ornelas's mother called her to tell her to speak to Ornelas's post-conviction counsel.

Ornelas testified that when he arrived at the 5th District Headquarters, he was taken to a "little room" and handcuffed to "a little hook in the wall." The room was approximately six feet by ten feet and had one window with closed blinds. Approximately one hour later, Agent Hwang brought Detectives Brownfield and Yucaitis into the room. Ornelas indicated that Detective Brownfield introduced himself as an Assistant State's Attorney, but that he knew Brownfield was lying. Agent Hwang then left Ornelas alone with the detectives. After Agent Hwang left, Ornelas testified that he immediately "invoked [his] 5th Amendment" and "told them [he] refuse[d] to say anything without an attorney." Detective Yucaitis told Ornelas that he was "not getting no attorney" and began hitting him. He backhanded Ornelas and boxed his ears, which was "extremely painful." Both detectives then began cursing at Ornelas and threatening him with the death penalty if he did not confess to the murders of Mosqueda and Cheeks. For around fifteen minutes, the detectives hit Ornelas on the head and kicked him in the shin and instructed Ornelas to confess to the double homicide and assert self-defense. Although he had heard about the murders of Mosqueda and Cheeks, Ornelas claimed he had no knowledge of the specifics of the incident. He testified that the detectives told him about the details surrounding the murders, including that the victims had been shot while they were in a car. Ornelas indicated that the detectives told him to say that he had shot the victims because they had tried to run him over with the car.

When Detectives Yucaitis and Brownfield left the room, Agent Hwang returned and urged Ornelas to tell them what they wanted to hear. Agent Hwang left briefly and then returned to the interview room with both detectives. At that point, Ornelas contended, he made an alibi statement and told the detectives that he had been in the Chicago Heights area at the time of the murders. He testified that he made the statement so "they could quit jumping on [him]." Agent Hwang wrote down Ornelas's statement, but did not show Ornelas what he had transcribed. After Ornelas made the statement, the detectives "gave a little eye look" to Agent Hwang and he left the room. Ornelas noted that Agent Hwang was never in the room when he was being abused by the detectives. As soon as Agent Hwang left, Ornelas testified that the detectives started "with the lefts and rights again" and Detective Yucaitis also grabbed Ornelas's testicles "like Steve Rymus." Ornelas did not make any additional statement, and the two detectives left him in the room alone for several hours.

At around 8:00 p.m., Agent Hwang returned with Detectives Yucaitis and Brownfield, and Ornelas said that he was ready to provide them with a statement. When Agent Hwang left to obtain paperwork to record Ornelas's statement, Detectives Yucaitis and Brownfield stepped on Ornelas's feet, boxed his ears, grabbed his testicles, and threatened to kill him if he did not deliver the correct statement. When Agent Hwang returned to the room, Ornelas made a statement in which he admitted to shooting Mosqueda and Cheeks and claimed to have done so in self-defense. Agent Hwang made a written record of Ornelas's statement, and

read it back to Ornelas, but Ornelas refused to sign the confession because it was "not a true statement at all." Ornelas did, however, write his initials "R.O.," after the last sentence of the statement.

After he made his statement, Ornelas testified that Detectives Brownfield and Yucaitis drove him to the Area 2 police station. During the trip, the detectives told Ornelas that they were bringing him back to "[their] house" and warned him to continue to cooperate or else they would "beat [him] worse." After Ornelas arrived at Area 2, he was placed in an interview room and Detective Brownfield told Ornelas that he would be crippled or killed if he did not make a statement to the Assistant State's Attorney.

According to Ornelas, when ASA Gerhardstein arrived to speak with Ornelas, the prosecutor already had a statement written out. Detective Brownfield remained in the room and gave Ornelas "the evil eye" as ASA Gerhardstein read the statement to him. Ornelas signed his name to the statement wherever he was told to, and explained that he did so so that he "wouldn't keep getting beat up by these two guys." Nothing in the statement, however, was true. Ornelas acknowledged that certain corrections to the statement were made and that he initialed the corrections, but indicated that he purposefully misspelled his name "Ornelos" at the bottom of the statement because it "was a bogus statement and none of this had happened." Misspelling his name was Ornelas's way of trying to show that he did not agree with the statement. Ornelas testified that he was later charged with the murder of Mosqueda and Cheeks and taken to Cook County Jail, where he received a medical

examination. He told the doctor about the treatment he had received from Detectives Yucaitis and Brownfield and that his testicles and ears hurt, but Ornelas did not know if the doctor recorded his complaints.

After Mullane was appointed to represent Ornelas, Ornelas stated that he had several conversations with Mullane about the circumstances surrounding his statement and had told Mullane how the detectives had "hit [him] in [his] ears, how they squeezed [his] testicles, stepped on [his] feet, kicked [him] in the shin, went up side [his] head [ ], top of [his] head, stuff like that." Ornelas made it clear to Mullane that he only made the statement in response to the conduct of Detectives Yucaitis and Brownfield. He also told Mullane that his friend Steve Rymus "got jumped on too" by Area 2 personnel. Mullane, in turn, advised Ornelas about the Goldston Report and told him that Detective Yucaitis had previously been implicated in torture allegations. As a result of their conversations, Mullane filed a motion to suppress Ornelas's statement and they discussed the strategies that Mullane intended to pursue to suppress the statement. Specifically, Ornelas claimed that Mullane informed him that he was not going to call Ornelas to testify at the suppression hearing. Rather, Mullane told Ornelas he was going to show that Ornelas was under the influence of narcotics at the time of the statement and he would let the State "bury themselves." Ornelas, however, told Mullane several times before, during, and after the suppression hearing that he wanted to testify, but Mullane wanted to "save" Ornelas's testimony for trial and did not call him.

When the motion to suppress was denied and the case proceeded to trial, Ornelas again told Mullane on several occasions that he wanted to testify about the circumstances surrounding his statements. When the State rested its case-in-chief, Ornelas reiterated his desire to testify, but Mullane told Ornelas that his testimony was not needed because the State had no case. Ornelas never testified and he did not voice his objection to the trial judge or to the second- and third-chair defense attorneys appointed to represent him.

During the post-conviction hearing, on cross-examination, Ornelas acknowledged that his hearing testimony contained many details that were omitted from the affidavit he submitted in support of his post-conviction petition. In his affidavit, Ornelas did not allege that Agent Hwang advised him to say that he committed the murders in self-defense or that Detective Brownfield initially introduced himself as an ASA. Nor did the affidavit include allegations that the detectives stepped on Ornelas's feet, squeezed his testicles, chipped his tooth, provided him with details of the crime, or that they ordered him to plead self-defense. When asked to explain these inconsistencies, Ornelas explained that his affidavit was merely a "basic summary of everything that went down," rather than a detailed account of the events that occurred. Ornelas confirmed that all of the abuse occurred at the Illinois State Police Headquarters and that he was never beaten at Area 2. Ornelas also admitted that he never informed the trial judge of the purported abuse when he made his statement in allocution before receiving his

sentence even though he was facing the death penalty and that he thanked his attorneys for their efforts when he addressed the court.

On cross-examination, Ornelas also acknowledged that he knew Jay Mosqueda and that Mosqueda was a member of a rival gang. Specifically, Ornelas indicated that Mosqueda was a member of the King Cobra street gang and that Ornelas had been a member of the Vice Lords street gang. Ornelas indicated, however, that he was an "inactive" member of the Vice Lords at the time of Mosqueda's murder because he was enrolled in Columbia College and was "trying to escape all that type of lifestyle."

Phil Mullane (Ornelas's trial counsel) testified that in November 1990, he was aware of the allegations of abuse that were said to occur at Area 2 as well as the Goldston Report that documented investigations into Area 2 "and the group of beaters there." When Mullane commenced his representation of Ornelas, he issued subpoenas to obtain any records pertaining to Ornelas's arrest. In response, Mullane obtained a report completed by the Frankfort Emergency Medical Technician (EMT) that showed that Ornelas was under the influence of drugs when he was arrested. The report, however, did not document the existence of any physical injuries on Ornelas's person. Mullane found the report significant in that it showed him that Ornelas "was not in his right mind" at the time of his arrest and initial incarceration. Mullane also received documentation of the statements that Ornelas had made to Chicago detectives and ASA Gerhardstein.

Mullane stated that he had several conversations with Ornelas about the statements that Ornelas made to the police as well as the circumstances surrounding his arrest. Initially, Ornelas acknowledged making the inculpatory statements, but simply shrugged his shoulders when Mullane asked him why he had done so. Ornelas also told Mullane that he did not have a clear memory of the events that transpired following his arrest because he had ingested PCP and "was out of it." Because Mullane was well aware of the investigations that had been done into the treatment of prisoners at Area 2 and had knowledge of the tactics rumored to occur there, Mullane asked Ornelas about his interactions with the Area 2 detectives to whom he had confessed. Specifically, Mullane asked Ornelas whether they had put a bag or typewriter cover over his head, used a cattle prod on him, or hit him with a telephone book, but Ornelas denied that he had been abused in any of those ways. When Mullane asked Ornelas whether the detectives hit him, Ornelas replied that he had been hit on the back of his head. When Mullane asked for more details, Ornelas explained that when he was left alone in the interview room for long periods of time, he would put his head down to rest and that the detectives twice "swatted" him on the back of the head when they reentered the room to "wake him up" and reinitiate conversation with him.

According to Mullane, during the time that Mullane represented Ornelas, Ornelas never informed him that Detective Brownfield initially introduced himself as an ASA or that either of the detectives backhanded him across the face, boxed his ears, stomped on his feet, kicked his shins, or grabbed his testicles. Ornelas also

never made any complaints to Mullane about his treatment by ASA Gerhardstein and did not tell Mullane that ASA Gerhardstein had written out a statement even before speaking to Ornelas. Mullane also denied that Ornelas ever informed him that he had intentionally misspelled his name on the statement because it was not true or that Steve Rymus had been abused by Area 2 personnel and had been asked to incriminate Ornelas.

Mullane acknowledged, however, that he had filed a number of motions on Ornelas's behalf, including motions to quash his arrest and suppress his statement. With respect to the motion to suppress, Mullane testified that he argued that Ornelas's statement was involuntary because he was under the influence of drugs. Mullane indicated that based on the E.M.T. reports, hospital reports, and observations of the Frankfort State Police, there was "no dispute" that Ornelas had been high at the time of his arrest. Mullane explained that he believed his best strategy to succeed on the motion to suppress was to argue that Ornelas did not have the capability to knowingly and voluntarily waive his *Miranda* rights and make a statement given the clear evidence that he was under the influence of drugs.

Mullane spoke to Ornelas on a number of occasions about the theory underlying the suppression motion and told Ornelas that there was no reason for Ornelas to testify at the suppression hearing. Mullane explained that because the theory behind the motion was that Ornelas was under the influence of drugs and was "out of it" at the time he was arrested and gave his statement, any coherent testimony by Ornelas at the hearing that demonstrated that he could recount the

17

chronological order of the events that occurred at the time of his arrest or statement would "undercut our whole plan." Ornelas understood and agreed with Mullane's strategy and never made any demand to testify at the suppression hearing.

When the motion was denied and the case went to trial, Mullane conversed with Ornelas on about twenty to thirty occasions about trial strategy. Specifically, they conversed about advancing a self-defense theory because Ornelas's statement said that he shot the victims when they attempted to run him down in a car. Based on the ruling at the suppression hearing, the statement would be entered into evidence, and Mullane believed that self-defense was the best strategy to pursue. Mullane also spoke to members of Ornelas's family about a self-defense strategy. Because they would be advancing a legal defense, Mullane advised Ornelas to proceed by way of a bench trial because it is "easier to educate one man, a Judge, a lawyer, than it would be 12 citizens" in a jury trial. Ornelas agreed.

During the trial, Mullane was optimistic because several of the State's witnesses, including Luedtke, the State's key witness, had been impeached. As a result, Mullane did not believe it was necessary for Ornelas to testify and explained that to him, but reiterated that it was ultimately Ornelas's decision whether or not he wanted to testify. Ornelas elected not to testify and did not voice any complaint about Mullane's representation.

During the post-conviction hearing, on cross-examination, Mullane confirmed that it was well-known in 1990 and 1991 in the Public Defender's Office that abuse was rumored to have been systematically committed by Area 2 detectives in the

1970s and 1980s and that Detective John Yucaitis was "one [member] of the group of beaters." Because he knew of these rumors, Mullane had issued subpoenas to obtain Office of Professional Standards (OPS) files pertaining to Yucaitis and Brownfield. In addition, Mullane tried to ascertain whether Ornelas suffered abuse and asked him specific questions about his treatment by the Area 2 detectives. Although he asked Ornelas if he had been hit, Mullane acknowledged that he did not specifically ask Ornelas if the detectives had grabbed his testicles, boxed his ears, or pulled his hair. Moreover, although Mullane primarily sought to suppress Ornelas's statement on the basis that Ornelas was under the influence of narcotics at the time it was given, he nonetheless acknowledged that he included a claim in the suppression motion arguing that the statement was obtained as a result of physical coercion. Mullane explained that he did so because he "felt that the 2 hits in the [back of] the head [that Ornelas had reported] were sufficient to let [him] in good faith file [that claim.]"

Agent Hwang once again provided testimony consistent with his prior accounts. He testified that on November 15, 1990, he received a call to go to the Frankfort police station to interview four men including Ornelas and William Luedtke. During his conversation with Luedtke, Agent Hwang learned that Ornelas had told Luedtke that he was responsible for a recent double homicide in Chicago. Agent Hwang then contacted the Chicago Police Department and confirmed that there had been a recent double homicide in Chicago and that investigators were looking for a suspect named Robert Ornelas. Agent Hwang then transported

Ornelas to Illinois State Police District 5 Headquarters, placed Ornelas in an interview room, and waited for the detectives to arrive. The interview room had a window and faced the front desk. Hwang specified that the blinds on the window remained open at all times. During the drive over to his office, Hwang never told Ornelas to plead self-defense.

Detectives Yucaitis and Brownfield arrived at around 3:00 p.m. Agent Hwang introduced himself to the detectives and brought them to the interview room where Ornelas was sitting. Hwang was present when the detectives introduced themselves to Ornelas and did not hear Detective Brownfield tell Ornelas that he was an ASA. Because Ornelas was in his custody, Hwang remained in the room with Ornelas when the detectives began questioning him. Hwang never saw the detectives hit the back of Ornelas's head, box Ornelas's ears, strike Ornelas in his jaw, step on his feet, kick Ornelas's shins, hit Ornelas in the ribs, pull his hair, or squeeze his testicles. Moreover, Hwang never heard Detectives Yucaitis or Brownfield provide Ornelas with details of the crime, threaten him to confess, or urge him to plead self-defense. During this initial encounter, Ornelas provided the detectives with an alibi statement, but it was not recorded. After hearing Ornelas's alibi, Agent Hwang and the detectives left Ornelas in the interview room in the custody of the trooper sitting at the front desk of police headquarters and traveled to the Will County Jail.

When they arrived at the Will County Jail, Agent Hwang and the detectives spoke to Luedtke. One of the detectives recorded Luedkte's statement, and the three men returned to speak with Ornelas at District 5 Headquarters. They informed

Ornelas that they had spoken to Luedtke and "found out what happened." They did not, however, tell Ornelas the specific details of Luedtke's statement. In response, Ornelas acknowledged that he committed the double murder and said that he had done so in self-defense. Hwang asked Ornelas to provide a written statement, and Ornelas assented to Hwang's request. Hwang then transcribed Ornelas's statement and gave it to Ornelas to read, initial, and sign. Hwang never left the detectives alone with Ornelas before taking Ornelas's statement, and Hwang denied that the detectives threatened or physically abused Ornelas in any way. After signing his written statement, Ornelas was released into the custody of Detectives Yucaitis and Brownfield.

During the post-conviction hearing, on cross-examination, Hwang acknowledged that the events occurred approximately eighteen years ago and he did not remember every detail concerning Ornelas's arrest, questioning, *Miranda* rights waiver, and statement. Hwang also acknowledged that Ornelas did not sign his name on the signature line provided at the end of the written statement. Instead, Ornelas placed his initials directly after the last sentence of the statement.

ASA Gerhardstein testified that on November 15, 1990, he received a call to respond to Area 2. At that time, Ornelas was in custody and was a suspect in the murder of Jay Mosqueda and Robert Cheeks. Once he arrived at Area 2, ASA Gerhardstein and Detective Brownfield went into the interview room to converse with Ornelas. ASA Gerhardstein denied that, at the time that he entered the interview room, he had a pre-written statement detailing Ornelas's involvement in

the double murder that he wanted Ornelas to sign. Instead, ASA Gerhardstein testified that he read Ornelas his *Miranda* rights and that Ornelas agreed to speak with him. After hearing Ornelas's account of the murders, Gerhardstein left Ornelas in the interview room for around thirty minutes while he transcribed Ornelas's statement. All of the details in the written statement were provided to ASA Gerhardstein by Ornelas. Gerhardstein recalled that he asked whether Ornelas had been treated well by the police, and Ornelas said that the officers had treated him well. He confirmed that Detective Brownfield was present the entire time that Ornelas relayed his statement. After ASA Gerhardstein transcribed Ornelas's statement, he read the statement to Ornelas. Certain corrections were made, and Ornelas signed the statement.

Steven Brownfield testified that on November 15, 1990, he and his partner, Detective John Yucaitis, received an assignment to interview Ornelas, who was a person of interest in a recent double homicide. In response to questions about his whereabouts on the night of the murders, Ornelas initially told them that he was partying with some girls in Chicago Heights, but he was unable to provide any names or phone numbers of the persons he was with. After hearing Ornelas's alibi statement, Detective Brownfield, Detective Yucaitis, and Agent Hwang went to the Will County Jail to interview William Luedtke. When they arrived, Luedtke agreed to permit Detective Yucaitis to transcribe a written statement detailing Luedtke's knowledge of Ornelas's involvement in the double murder. Detectives Brownfield and Yucaitis, Agent Hwang, and Luedtke all signed the statement. They then

returned to the Illinois State Police Headquarters to talk to Ornelas once more. Detective Brownfield told Ornelas that they had just spoken to Luedtke and that he had just implicated Ornelas in the double murder of Cheeks and Mosqueda. In response, Ornelas initially paused. He then responded that he had shot them in self-defense because they were going to run him over with a car. Agent Hwang recorded Ornelas's statement. Nobody told Ornelas what to say or forced Ornelas to sign or initial the statement.

Detectives Brownfield and Yucaitis then took Ornelas into their custody and drove him to Area 2. During the drive, neither Brownfield nor Yucaitis instructed Ornelas to tell the ASA that he shot Mosqueda and Cheeks in self-defense or threatened to beat him if he failed to do so. Once they arrived back at Area 2, Detective Brownfield contacted the Cook County State's Attorney's Office Felony Review Unit and ASA Gerhardstein responded to his call. When ASA Gerhardstein arrived, Detectives Brownfield and Yucaitis apprised him of the case. Detective Brownfield then took ASA Gerhardstein to meet with Ornelas, and Brownfield remained in the room while Ornelas made a statement to Gerhardstein. ASA Gerhardstein then prepared a written statement, which Ornelas signed. Ornelas also made several corrections to the statement. Nobody forced Ornelas to sign the statement.

Detective Brownfield denied that he or his partner ever physically abused Ornelas. Specifically, he denied that either one of them had punched Ornelas, boxed his ears, pulled Ornelas's hair, stepped on his feet, or squeezed his testicles.

Detective Brownfield also denied that he or his partner ever threatened Ornelas with the death penalty or instructed Ornelas to claim self-defense.

During the post-conviction hearing, on cross-examination, Detective Brownfield acknowledged that he worked with Lieutenant Jon Burge for approximately four or five months in 1986 and that Detective Yucaitis had been his partner since December 1987. During his tenure as an Area 2 Violent Crimes Detective, Brownfield denied that he had ever beaten a suspect in his custody. Moreover, Detective Brownfield never observed Detective Yucaitis beat a suspect in his custody during their partnership. Detective Brownfield acknowledged that he received a subpoena in 2004 to testify before a grand jury about the alleged systematic abuse that occurred at Area 2 and that he invoked the Fifth Amendment in response to questions posed to him before the grand jury. He indicated that he "took the Fifth * * * on the advise [sic ] of [his] attorney."

After reviewing the evidence, the trial court entered a detailed written order dismissing Ornelas's post-conviction petition. In doing so, the court found that "Ornelas's recollection of the facts regarding his conversations with his attorney and the circumstances surrounding his confession is not credible since it is not corroborated by other witnesses or evidence." In so finding, the court noted that all of the alleged abuse occurred when Ornelas was at District 5, not Area 2. Agent Hwang testified that Ornelas was never left alone with either of the detectives while he was in Hwang's custody and that the conversations between Ornelas and the detectives took place in an interview room with a window that faced the front

desk. Moreover, although Ornelas claimed that ASA Gerhardstein arrived to talk to him with a pre-written statement, the court found it significant that the statement contained details that were not present in the police report, including the name of Ornelas's high school and the fact that he walked to a friend's house in Whiting, Indiana, after the shooting.

Although Ornelas had testified that he told his attorney that he was physically abused by Detectives Brownfield and Yucaitis, the court found Attorney Phil Mullane's evidentiary-hearing testimony to be "more credible." The court further found that Mullane's trial strategy was "perfectly reasonable." Specifically, the court observed: "Mullane conceded that Ornelas told him that he was hit twice in the back of the head so that he would wake up but also remembered that Ornelas denied any other abuse. Because very little evidence existed which sustained an a[rgu]ment that Ornelas was physically and mentally abused, it was not unreasonable for Ornelas's attorney to focus more of his argument on the fact that his statements should be suppressed based on the fact that Ornelas was under the influence of drugs when he made them." With respect to Ornelas's allegation that Mullane should have called Steve and Mary Rymus to testify about Area 2 abuse, the court found that it was "difficult to believe Ornelas's claim that he told Mullane to call either as a witness since Rymus testified that he never told Ornelas that he was abused by Yucaitis or Brownfield." The court similarly rejected Ornelas's contention that trial counsel should have called witnesses identified in the Goldston Report because Ornelas's account of abuse differed from the type of abuse identified

in the Report. Ultimately, the court concluded that Ornelas "failed to identify ineffective assistance" of trial counsel. Because trial counsel was not ineffective, the court also concluded that appellate counsel was not ineffective for challenging trial counsel's representation on appeal.

The Appellate Court of Illinois affirmed the trial court's judgment. Ornelas has now filed a federal habeas petition in this Court.

## II. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, a state petitioner seeking a writ of habeas corpus in federal court must first exhaust the remedies available to him in state court, 28 U.S.C. § 2254(b)(1)(A), "thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights," *Cheeks v. Gaetz*, 571 F.3d 680, 685 (7th Cir. 2009) (internal quotation marks and citation omitted). A habeas petitioner must fully and fairly present his federal claims through one complete round of the state appellate review process before filing a federal habeas petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). If a petitioner has failed to properly assert his federal claims at each level of state review, his claims are procedurally defaulted. *See McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013). A claim is also procedurally defaulted when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, making the state court's refusal to adjudicate the claim an independent and adequate state ground for denying federal review. *Cone v. Bell*, 556 U.S. 449, 465 (2009). Either way,

procedural default precludes federal-court review of a petitioner's habeas claims. *See Mulero v. Thompson*, 668 F.3d 529, 536 (7th Cir. 2012). A habeas petitioner may overcome procedural default, however, either by demonstrating cause for the default and actual prejudice from the default, or by showing that the court's failure to consider the claim would result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Thus, procedural default, although otherwise a bar to federal habeas review, may be excused in certain circumstances.

If the petitioner successfully runs the procedural-default gauntlet for a particular claim, then a federal court can at least consider the merits of that federal habeas claim. But under AEDPA, a federal court may not grant habeas relief unless the state court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Alternatively, under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 413. But even if a federal court independently concludes that the relevant state-court

decision applied clearly established federal law erroneously, still the writ does not necessarily issue; rather, the state court's application must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "This is a difficult standard to meet; 'unreasonable' means 'something like lying well outside the boundaries of permissible differences of opinion.'" *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (quoting *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002)).

### III. Analysis

In his habeas petition, Ornelas raises five claims. First, he argues that trial counsel, Phil Mullane, was ineffective for failing to advance a coercion/duress theory in support of his motion to suppress his confession. Am. Habeas Pet. at 3. Relatedly, Ornelas argues that Mullane was ineffective for failing to interview William Luedtke and Steve Rymus to substantiate the coercion/duress theory. *Id.* at 3-4. Third, Ornelas argues that the reviewing judge on his post-conviction petition, a former member of the State's Attorney's Office of Felony Review involved in the Burge torture cases, should have recused himself *sua sponte*. *Id.* at 4-5. Fourth, Ornelas argues that Mullane was ineffective for arguing at trial that Ornelas acted in self-defense—limiting the availability of other substantive defenses—without Ornelas's approval. *Id.* at 6. And finally, Ornelas argues that the trial court abused its discretion by denying Ornelas's motion to quash his arrest. *Id.* at 6-7.

In response, the State argues that Ornelas's first four claims are procedurally defaulted, and Ornelas's fifth claim is barred by the Supreme Court's holding in *Stone v. Powell*, 428 U.S. 465, 482 (1976). R. 25, State's Answer at 26. Because a

finding of procedural default would preclude consideration of Ornelas's claims on the merits, the Court first considers whether Claims One through Four are defaulted.

## A. Claims One Through Four

To preserve a claim for federal habeas review, a state prisoner must "assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Malone v. Walls*, 538 F.3d 744, 753 (7th Cir. 2008) (internal quotation marks and citation omitted). "[I]n Illinois, this means that a petitioner must have . . . appealed to the Illinois Appellate Court and presented the claim in a petition for leave to appeal to the Illinois Supreme Court." *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007). "A petitioner fairly presents his federal claim to the state courts when he articulates both the operative facts and the controlling legal principles on which his claim is based." *Perruquet v. Briley*, 390 F.3d 505, 519 (7th Cir. 2004).

The State argues that Claims One through Four of Ornelas's habeas petition are procedurally defaulted because Ornelas did not fairly present them through one complete round of state-court review. State's Answer at 26. As to Claim One (that Mullane was ineffective for failing to argue at the suppression hearing that Ornelas's confession was coerced), the State argues that Ornelas raised the issue of Mullane's ineffectiveness in his post-conviction petition [R. 26-18, State's Exh. AA] and again on post-conviction appeal to the Illinois Appellate Court [R. 26-2, State's Exh. G], but then abandoned the claim in his petition for leave to appeal (PLA)

before the Illinois Supreme Court [R. 26-4, State's Exh. K]. *Id.* at 28. As to Claims Two through Four, the State contends that Ornelas has never before claimed that Mullane was ineffective for failing to interview Steve Rymus or for failing to obtain Ornelas's approval to pursue a self-defense strategy at trial, nor that the judge who presided over the post-conviction proceedings violated his due-process rights by failing to recuse himself. *Id.* at 27.

Ornelas does not dispute that his claims are defaulted, and instead tries to excuse the defaults. *See* R. 31, Pet'r's Reply Br. Before getting to the excuses, the Court's independent review of the record reveals that the claims are indeed defaulted. Ornelas has not fairly presented Claims One through Four through one complete round of state-court review. As to Claim One, it is true that Ornelas clearly argued in his post-conviction appeal to the Illinois Appellate Court that Mullane was ineffective for not presenting evidence that his confession was coerced. State's Exh. G at 2, 39-40. And, contrary to the State's contention, Ornelas also raised Claim Two by arguing that "Mullane's performance was also deficient because he failed to interview Steve Rymus, who could have corroborated Ornelas' claims of abuse." *Id.* at 41. Whether Ornelas raised Claim Four in his post-conviction appeal is less clear: Ornelas argued that "Mullane's performance at trial was also constitutionally deficient where counsel pursued a self-defense strategy that was unsupported by the evidence." *Id.* at 42. But this is not quite the argument that Ornelas now advances in Claim Four, which challenges Mullane's self-defense

strategy on the grounds that Mullane adopted the strategy—and thus waived Ornelas's substantive defenses—without Ornelas's approval. Am. Habeas Pet. at 6.

As it turns out, it does not matter whether Ornelas properly raised each ineffective-assistance claim before the Illinois Appellate Court because each claim is nevertheless defaulted: Ornelas did not raise them in his petition for leave to appeal (PLA) to the Illinois Supreme Court. *See* State's Exh. K; *Guest*, 474 F.3d at 930. The PLA challenged Ornelas's conviction as the product of a coerced confession, with no reference whatsoever to Mullane's alleged ineffectiveness. *See* State's Exh. K. Indeed, the only mention of Mullane in the PLA was Ornelas's argument that the appellate court erred in crediting his testimony that Ornelas never reported abuse by Brownfield and Yucaitis. *Id.* at 10-13, 16. Ornelas cannot be said to have fairly presented the issue of Mullane's ineffectiveness in his PLA. *See Perruquet*, 390 F.3d at 519 ("A petitioner fairly presents his federal claim to the state courts when he articulates both the operative facts and the controlling legal principles on which his claim is based."); *Chambers v. McCaughtry*, 264 F.3d 732, 738 (7th Cir. 2001) ("A mere passing reference to a constitutional issue certainly does not suffice." (internal quotation marks and citation omitted)). Accordingly, Claims One, Two, and Four are procedurally defaulted for failure to include them in the PLA during the post-conviction stage.

Claim Three of Ornelas's habeas petition alleges that Judge Nicholas Ford, who presided over Ornelas's post-conviction hearing, should have recused himself from the case *sua sponte*, as a former member of the State's Attorney's Office of

Felony Review involved in reviewing Area 2 cases. Am. Habeas Pet. at 4-5. Naturally, Ornelas could not have raised this claim on direct appeal, after the bench trial and before the post-conviction stage. But a review of the post-conviction record confirms that he did not raise the argument in post-conviction proceedings either. *See* State's Exh. G; State's Exh. K. Once again, Ornelas does not contend that he fairly presented these claims to the state courts, and the Court finds that Claims One through Four of Ornelas's habeas petition are procedurally defaulted. The only question now is whether sufficient cause exists to excuse those defaults.

An otherwise defaulted claim can be saved by showing either (1) cause for the default and resulting prejudice or (2) that excusing the default is necessary to prevent a fundamental miscarriage of justice. *Perruquet*, 390 F.3d at 514. The first exception requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts to raise the claim in state court." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (internal quotation marks and citation omitted). The petitioner must also show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). A miscarriage of justice arises only in cases of "actual innocence," in which a petitioner is required to show that "more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

Ornelas offers two arguments for why his defaults should be excused: (1) little was known about the abuse and "cronyism" of Area 2 at the time of his trial, and (2) Judge Ford's involvement in the Area 2 cases, as a former assistant state's attorney, was unknown until an article was published detailing his involvement. Pet'r's Reply Br. at 4-6. Neither argument is correct. On the first point, Mullane testified that "it was well-known in 1990 and 1991 in the Public Defender's Office that abuse was rumored to have been systematically committed by Area 2 detectives in the 1970's and 1980's and that Detective John Yucaitis was 'one [member] of the group of beaters.'" State's Exh. J ¶ 57. As a result, Mullane (1) specifically asked Ornelas about his interactions with the Area 2 detectives to whom he had confessed—including whether Ornelas had been hit or otherwise abused, and (2) subpoenaed Office of Professional Standards files pertaining to Yucaitis and Brownfield—as was standard operating procedure when anyone in Area 2 was involved in an investigation. *Id.* ¶¶ 57-58. Moreover, Ornelas himself attached to his post-conviction petition a report detailing the systemic physical abuse of suspects by Area 2 personnel under the tenure of Chicago Police Lieutenant Jon Burge. *Id.* ¶ 36. In light of this information, Ornelas has not established cause for procedural defaults as to claims that he, in fact, raised in state court and later abandoned.

As to the second point—which can only bear on Claim Three—Ornelas argues that his default should be excused because Judge Ford "was not the same ASA that approved the charges over Ornelas, but was in charge of the office that did. Thus

[Ornelas] had never met with ASA Nick Ford . . . [and] [i]t did not occur to him or his post conviction counsel to make that connection until after the article came out." Pet'r's Reply Br. at 6. Far from establishing "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim in state court," *McCleskey*, 499 U.S. at 493, Ornelas's argument underscores both the discoverability of this information and its infirmity as grounds for relief. "If a petitioner has failed to develop the factual basis of a claim in state court, a federal court cannot grant relief unless the claim relies on a new rule of constitutional law, or a factual predicate that could not have been previously discovered through the exercise of due diligence." *Harris v. McAdory*, 334 F.3d 665, 669 (7th Cir. 2003) (citing 28 U.S.C. § 2254(e)(2)(A)). The fact that it did not "occur to [Ornelas] or his post conviction counsel" to inquire into Judge Ford's professional history falls far short of establishing that the information could not have been discovered through the exercise of due diligence. And the fact that Judge Ford's association with the case was too attenuated to make the connection readily apparent only further weakens Ornelas's claim. Under the circumstances, Ornelas has not established that his defaults should be excused for cause.[4]

Nor has Ornelas established that a failure to excuse his procedural defaults would result in a fundamental miscarriage of justice. *See Perruquet*, 390 F.3d at

---

[4]Even if Ornelas's proffered reasons constituted sufficient cause, his claims would remain defaulted absent a showing of actual prejudice—that is, that the errors in his trial "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *See Frady*, 456 U.S. at 170. For the reasons stated in the extremely thorough state-court review of Ornelas's claims, *see* State's Exh. J ¶¶ 88-90, Ornelas would not be able to meet this high standard.

514. He uses the phrase just once to suggest that "[t]o say [Claim Three] is procedurally barred . . . or does not allege fundamental miscarriage of justice is dishonest," Pet'r's Reply Br. at 6-7 (footnote omitted), but offers no argument in support—and certainly does not broach the "actual innocence" standard that the Supreme Court has set out for this inquiry. *House*, 547 U.S. at 538. For these reasons, Ornelas has failed to demonstrate that the Court should excuse his procedural defaults, and he has thus forfeited his right to federal review on Claims One through Four.

## B. Claim Five

Claim Five of Ornelas's habeas petition alleges that the trial court abused its discretion in denying Ornelas's motion to quash his arrest and custodial interrogation when neither was supported by probable cause. Am. Habeas Pet. at 7. In its answer, the State contends that Ornelas is barred from relitigating this claim under the Supreme Court's holding in *Stone v. Powell*. 428 U.S. 465, 482 (1976) ("[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."). The Seventh Circuit has interpreted *Stone* to mean that "federal courts hearing collateral attacks under § 2254 may not enforce the exclusionary rule unless the state judiciary denied the defendant a full and fair opportunity to contest the search or seizure." *Hayes v. Battaglia*, 403 F.3d 935, 939 (7th Cir. 2005).

Ornelas does not contend that Illinois withheld a full and fair opportunity to litigate his Fourth Amendment claims. In fact, he concedes that "it is true that [Ornelas] had a full hearing on his motion to quash arrest and suppress evidence." Pet'r's Reply Br. at 7 (internal quotation marks omitted). He merely argues that Mullane's failure to adequately present a coercion defense at that hearing merits relitigation of that claim. *Id.* Under *Stone* and its Seventh Circuit progeny, there is no basis for relief on this claim. Accordingly, Claim Five is also denied.

## IV. Conclusion

For the reasons discussed above, Ornelas's habeas petition [R. 11] is denied. If Ornelas seeks to appeal the denial of his habeas petition, he must first obtain a certificate of appealability. Under 28 U.S.C. § 2253, "an appeal may not be taken to the court of appeals from the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court" unless the circuit justice or judge first issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A). A certificate of appealability may issue only when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing, a petitioner must show that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks and citation omitted). For the reasons discussed above, Ornelas has not made a substantial showing of the denial of a constitutional right;

reasonable jurists would not debate whether the challenges in his habeas petition should been resolved differently or determine that Ornelas deserves encouragement to proceed further with his habeas claims. *See Rutledge v. United States*, 230 F.3d 1041, 1047 (7th Cir. 2000). The Court therefore declines to issue a certificate of appealability.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: July 2, 2014